WILLIAMS *vs.* ELLICOTT.

APPEAL from the equity side of *Baltimore* county court. The facts appearing by the bill and answer, were these: On the 30th day of August 1819, the appellant was appointed *provisional* trustee for the benefit of the creditors of *Amos A. Williams*, under the act of assembly, entitled, "An act relating to insolvent debtors in the city and county of *Baltimore*," 1816, *chap.* 221. On the 15th October 1819, the appellee was appointed permanent trustee under the same law. Under an expectation that the party, applying for the benefit of the insolvent laws, would be enabled to make an arrangement with his creditors, whereby his application for such benefit would be withdrawn, the appellant, when called on by the appellee to deliver over to him the effects, &c. of the insolvent, declined to do so, and assigned, as a reason for such refusal, that the arrangement with the creditors was in progress, and that, when it was finally disposed of, the delivery would be made. In *December* 1819, the negociation ceased, the creditors having declined to accept the proposition of the debtor, under circumstances which, the appellant conceived, (as stated in his answer to the bill of complaint,) justified him in refusing to deliver the effects to appellee, until compelled to do so in due course of law. The appellant also alleged, as a cause of such refusal, that the *United States* were creditors of the insolvent, and that he would not deliver the effects, until the claim of the government was first satisfied thereout. The county court, after ratifying the payments by the ap-

*A provisional trustee is bound, when demanded, to deliver over to the permanent trustee the estate and effects of the insolvent If he was entitled to a reasonable compensation for his services as a provisional trustee, (and quere, if he was so entitled?) he forfeited any claim which he might have so had by refusing to deliver over the estate and effects to the permanent trustee For the same reason he is liable for interest on the amount of funds in his hands The United States could not, in case of a delivery by a provisional trustee of the estate and effects of an insolvent debtor, to the permanent trustee, maintain their right of priority so as to subject the provisional trustee to personal liability by reason of his having so delivered the effects, without first discharging a debt due to the government from the insolvent.*

pellant to the government, (by the assent of the counsel for the appellee,) gave a decree for the entire balance in the hands of the appellant, *including interest thereon*, and *refused to allow to him any commission*, as trustee, a commission of 8 p. cent. (the usual commission allowed to trustees acting under the insolvent laws,) having been charged as an item in the account filed with the answer of the appellant in the court below.    From this decree the appellant appealed. The cause was argued before Buchanan, Ch. J. Earle, Martin, Stephen, and Archer, J.

*Taney*, for the Appellant, contended; *First*, That inasmuch as the *United States* have a priority to be paid out of an insolvent's estate, of which assignees, and other persons, are required to take notice, the appellant was *bound*, as trustee, to see to the payment of the *United States*, out of the estate in his hands, before he transferred the estate to the *second* or permanent trustee.    In support of this position he cited; *Colvin's Edit. Acts of Congress*, 1797, ch. 368, sec. 7, & 1799, ch. 128, sec. 65.    *Fisher vs. Blight*, 2 *Cranch*, 359.    *United States vs. Howland*, 4 *Wheat.* 108, and *(note* 118.) *Thelluson vs. Smith*, 2 *Wheat.* 396. But stated to the court, that he owed it to candour to acknowledge, that on this point he did not mainly rely.

*Secondly*. That on the principles of equity, and according to the spirit of the insolvent laws, the appellant is entitled to the usual commission for the time he administered the insolvent estate, (which extended to 15th October,) before the appointment of a permanent trustee, and until December, by the assent of such permanent trustee, at which latter date, a large amount of the estate was duly and faithfully administered, as he contended.    He admitted that there was no provision in the insolvent laws, which specified any commission or compensation to the provisional trustee, but contended, nevertheless, that if not entitled to the commission usually allowed to permanent trustees, he was at least entitled before a court of equity to a *pro rato* compensation for the time devoted to the trust under the provisions of the law—that is to say, whilst he lawfully acted as provisional trustee, and whilst he continued to act with the assent of the appellee. He assimilated his case to that of a trustee under the general insolvent laws, who, by removal, death, or the necessity of quitting the

1825.
Williams
vs
Ellicott

state, was superseded in the execution of the trust, by the appointment of a successor, in which cases, there could be no reason for refusing the first trustee a *pro rato* compensation, if not the entire commission, on the amount of funds collected by him, during the time that he faithfully acted in the management of the estate.  He contended also, that the duties of trustee, which, by the acts of 1805, and its supplements, were imposed upon a single officer, were by the act of 1816 divided among *two* officers, the provisional trustee, (an officer before unknown to the law,) and a permanent one, and that the omission to apportion the commission could only be supplied by a court of equity.  As to the item of interest claimed by the appellee, and decreed by the court below, he relied upon the settled law and practice of the courts, not to charge a trustee with interest, except under peculiar circumstances, none of which existed, as he contended, in this case, and especially as the appellant was not charged with any mismanagement of the estate, but had only erred, (supposing he did err,) in a belief that he had a right and indeed *was bound*, under his construction of the acts of congress, and of the decisions thereon, to pay the government of the *United States*, instead of handing over the whole estate to the appellee, and leaving it to him to do so.  That this conduct had not injured the interests of the creditors, as the right of priority of payment was an indisputable and undisputed right, established by the decisions of the highest judicial tribunal of this country, to which, upon all such subjects at least, this court, and every other court, state as well as federal, were bound to conform.  For these reasons he contended, that the item of a commission, or at least a portion of it, ought to have been allowed by the court below, and that the appellant should not have been charged with interest, and that the decree ought now to be reversed *pro tanto*.

*R. B. Magruder*, for the Appellee, contended, that the record could present but a single *question*, all the other points being wrapt up in that.  It was this, viz. Could the *United States*, in case of a delivery by the appellant, as provisional trustee, of the estate, effects, &c. of the insolvent, to the appellee, the permanent trustee, in obedience to the provisions of the acts of assembly, have so asserted and maintained their right of priority, as to have

subjected the appellant to personal liability by reason of his having so delivered the effects, without *first* discharging the debt due to the government? If this question should be decided affirmatively, then there could be no doubt that *interest* could not be claimed against the appellant, and a court of equity would do its utmost to allow him compensation, either in the shape of a commission, or in some other mode. He contended, that as *provisional* trustee, technically so called, the appellant was entitled to no compensation, that officer being a creature of the act of 1816, *ch.* 221, and no provision being made thereby for any commission, he being regarded by the law as a mere depositary for a short time, subject to no risk, bound to the performance of no duties, and being as it were, simply a stakeholder for the benefit of creditors, and in practice remaining such but a very few days. In support of this position, he cited *Kennedy vs. Boggs*, 5 *Harr. & Johns.* 408. He contended further, that if it was attempted to assimilate the provisional trustee, to trustees acting under deeds of trust, a court of chancery could not, consistently with established usage, supported by authority, allow him any thing by way of commission, *even if he behaved well,* unless indeed a provision could be shown to have been made in the deed of trust, allowing such compensation; and there could be no more reason why an omission in the act of assembly to provide for such compensation, should be supplied by a court of chancery, than such an omission in a deed of trust, should be supplied by it. In support, and by way of illustration of this position, the counsel cited *Robinson vs. Pett,* 3 *P. Wms.* 250. 2 *Fonbl.* 176, in notes and authorities there cited. But he contended, that even admitting, that under certain peculiar circumstances, a court of equity might, notwithstanding the omission in the law to provide compensation for a provisional trustee, under its general powers as a court of equity, be disposed to supply this omission by granting compensation to him, as would be done to a bailiff or agent of a mortgagee in possession, *exempli gratia,* yet it could only be in a case in which he was perfectly clear from all misbehaviour, or disobedience to the orders of the tribunal under which he acted; and unless such obedience could be shown, a court of chancery would always compel a payment even *of interest.* 2 *Fonbl.* 185, 6. He contended, that in the case at bar, the appel-

1825.

Williams
vs
Ellicott

Fant had misbehaved, by disobedience to the laws of the state, in his refusal to deliver over the effects, in such a manner as to forfeit any claim he might have had to a commission, under an application to the general equity powers of the court below, and had subjected himself to the superadded penalty of *interest*, by way of damages for such refusal. And although such refusal might have proceeded from a mistaken construction of the acts of congress, and from a belief that he was doing his duty in so refusing, and even under the sanction of the advice of counsel, as it appears by the answer of the appellant it did, yet that was a risk to which he subjected himself by his acceptance of the trust, and the law can make no allowance for such misconception, or mistake. 2 *Fonbl.* 172, book 2d, sec. 2d, *(note* c.) The question, therefore, still was, whether the appellant had misbehaved? And for the purpose of showing that he had, the counsel referred to the statute of bankruptcy 5 *Geo. II. ch.* 30, s. 30, (page 96 of *Cooper's Bankrupt Laws,)* which imposed upon the provisional assignee a fine of £200 for a refusal to surrender the estate of the bankrupt to the permanent assignees; and he cited also the act of congress of the *U. S.* 1800, *ch.* 173, sec. 7, *(Colvin's Ed. vol.* 3,) in which a penalty of $5000 is imposed upon the provisional assignee in case of neglect or refusal to deliver to a permanent assignee; and in which it is also declared, that the imposition of this penalty is not to affect the right of the creditors to proceed at common law against the provisional assignee for any damage occasioned by such refusal. He referred also to the act of assembly of *Maryland*, 1819, *ch.* 84, sec. 8, for the purpose of showing the opinion of the legislature upon this subject. From the provisions contained in these sections of the various statutes referred to, he argued, that unless it could be shown that the provisional trustee *was bound* to respect the paramount right of priority of payment, alleged by him to exist in the *United States* government, and was prohibited by the existence of that right, and by a certainty of his own personal responsibility, unless he retained funds to discharge it, from paying over to the permanent trustee, he could not claim compensation, and would be chargeable *with interest*, for the funds in his hands, so refused to be delivered over.

The question then is, as was stated in the outset, "could

the *United States* have compelled the provisional trustee to pay their claim, after he had surrendered to the permanent trustee, without retaining funds to satisfy the *U. S.* of whose claim he had notice?" The counsel for the appellee stated, that he did not mean to dispute the right of priority of payment which the government of the *U. S.* has, as claimed, and indeed established, by judicial decisions of high and revered authority. On the contrary, although he thought the doctrine had been pushed in this republican country quite far enough, to a point far beyond that to which it had been carried under the royal government of *Great Britain,* although it could be shown that the prerogative right of the *King of England* was far less extensive, yet after the decisions which have been made by the tribunal to which the sovereign power of this country have delegated the right to decide, he could not, for a moment, hesitate to yield to them his entire submission. Although there was no express grant of power, by the constitution, to the government of the union, to assume this right, nor any legislative act founded upon such express grant, yet the right is assumed as a necessary means whereby an end or purpose legitimate and constitutional may be accomplished. The constitution of the *U. S.* expressly grants the power to lay and collect imposts and duties, and requires the government to pay the debts of the nation. As congress has the power to exact payment of the duties, instantly upon the arrival of the goods, and the nation has a right to detain them, until such duty is paid, it has a right to superadd to the security given on a bond, the further provision, that in case of the death or insolvency of the importer, his estate shall *first* pay the claim of the government, to the exclusion of every body else. So, when the duty of paying the national debts, of raising and maintaining armies, and equipping fleets, for our protection; of establishing post offices and post roads, for our security, and convenience—of guaranteeing our republican forms of government—when all those duties devolve upon the national councils, it is perhaps no more than proper, as it is for the benefit of all the people of the *United States,* that the government should never be the loser, if a debtor left estate enough to pay their debt; and as every citizen is aware of this right of priority, it is not unjust, because all men con-

1825

vs
Privett

tract, with reference to it, and with a knowledge of its existence. He would not, therefore, with the feelings of reverence and affection which he entertained, in common with all who knew the value and the excellence of the constitution under which we live, withhold from the government of the union any of its just rights, whether the same are clearly and expressly granted, or are the result of necessary implication. On the contrary, both here and elsewhere, he would extend to it every right and privilege to which it was entitled. Indeed he should feel a reluctance, even in a legal discussion, to withhold from the national government the exercise of any right, if in his candid judgment they were entitled to it. The temple of justice was no place to hazard such sentiments. The profession to which he had the happiness to belong, ought not to be prostituted to a purpose so ignoble, more especially in a country like ours, the stability of whose government, the happiness of whose people, (and when he said that, he might add the happiness and hopes of all mankind,) depend upon the maintenance of correct principles upon the subject of the rights of the general and of the state governments respectively. It was upon the maintenance of proper sentiments on this all-important subject, that our most happy and glorious constitution is to be preserved, and with it the rights, the hopes, the liberties of mankind. And counsel could not be justified in advocating upon such a subject, merely for the sake of argument, sentiments and opinions which they condemned in their judgments, however they might be authorized to do so on mere questions of property. That in the courts of justice of the country, the depositaries of the sacred rights which our forefathers placed in their holy keeping, sentiments ought not to be hazarded for the mere purpose of making an ingenious argument on questions involving the liberties of ourselves, of our children, involving dear bought rights acquired with so much blood and treasure, and consecrated by so many sighs, and tears, and sufferings.

The counsel have endeavoured to show, that the true construction of the acts of congress, and of the several decisions made upon them was, that the debt due to the government of the *United States* was the "highest in dignity," and entitled to "priority of payment," out of the estate of the insolvent, but recoverable from that estate un-

1825.

Williams
vs
Ellicott

der the laws of the state of *Maryland*, and in the mode pointed out, and from the agents, trustees or officers, created by the provisions of those laws.    That this construction asserted and maintained in full force the powers of *both* governments, giving to that of the union the supremacy to which it was entitled, according to the will and intention of the people, and reserving to that of the *State* all its just rights.    That any other construction would lead to the establishment of a doctrine little less monstrous than this, viz. that congress might, under pretence of the government being a creditor, alter the laws of the states to direct descents, or the testamentary laws, &c. &c. subjects, with the regulation of which, it never was intended, or even dreamt, that the national government should in any wise interfere.    He cited *Dallas's* remarks in *Fisher vs. Blight*, 2 *Cranch*, 381, and the act of congress 1789, *ch.* 20, sec. 34, vol. 3d, page 70.    He then endeavoured to show, by several illustrations, the powers of the general and state governments respectively on particular subjects, and the complete independence and sovereignty which *each* had a right to exercise on given subjects, legislation upon which was prohibited to the other, from the nature and reason of the thing itself; and concluded, by endeavouring to show, that a construction contrary to that for which he contended, would amputate an important limb of state sovereignty, and thereby strike at the existence of that grand and delicate organization so complicated in its detail, yet so simple in its principle—that curious and beautiful economy of government, which could only be preserved by upholding that nicely adjusted balance which the authors of the constitution so skilfully and solicitously fashioned.

THE COURT.    Without determining the question how far this court, as a court of equity, or the court in which the decree was passed, had power to allow to a *provisional* trustee a proper compensation for his services, in a case in which he should appear to be clearly entitled to compensation, upon which point the court do not intend to give any opinion, we think, that even supposing that the appellant might have been entitled to a reasonable compensation for his services, before his refusal to deliver over the estate and effects of the insolvent, he forfeited any claim which he might have so had, by reason of his having so refused to

deliver, as the court have no doubt he was bound to do, upon the demand made on him by the appellee as permanent trustee. For the same reason he is liable for interest.

DECREE AFFIRMED.